Filed 3/15/16  In re D.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.W. et al., Persons Coming Under the Juvenile Court Law. | D068913 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.A.,<br><br>Defendant and Appellant. | (Super. Ct. No. SJ13148A-C) |

APPEAL from orders of the Superior Court of San Diego County, Kenneth Medel, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Senior Deputy County Counsel, for Plaintiff and Respondent.

R.A. appeals orders declaring his minor children D.W., D.A. and M.A. dependents of the juvenile court under Welfare and Institutions Code[1] section 300, subdivision (b), and placing the minors in the custody of their maternal grandparents. R.A. challenges the sufficiency of the evidence to support the court's jurisdictional findings and dispositional orders. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2014, R.A. and Andrea I., the minors' mother, voluntarily placed the minors with their maternal grandparents.[2] At that time M.A. was seven years old, D.A. was 11 and D.W. was 13. Andrea was struggling with long-standing alcohol addiction and admitted she could not safely parent the minors. The family also had a history of involvement with the San Diego County Health and Human Services Agency (the Agency), including a voluntary case successfully closed in 2010 that was opened as a result of Andrea's alcohol abuse and allegations of domestic violence by R.A. In November 2014, Andrea completed an inpatient alcohol rehabilitation program, but she did not complete outpatient services required by her aftercare plan and quickly relapsed.

On April 27, 2015, the maternal grandfather, David W., found Andrea intoxicated and naked in the family's apartment. Andrea told David she was being held captive by R.A., who had taken her clothes away to prevent her from leaving. David took Andrea to a motel room for safety, but she was picked up by R.A. shortly thereafter. Because David could not locate Andrea, on May 6, 2015, he filed a missing person report with the

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     Andrea and R.A. are married but currently separated. Andrea has not appealed the court's orders and is discussed only where relevant to the issues R.A. raises.

2

sheriff. Andrea was located a week later when she arrived at a hospital badly bruised all over her body. She was discharged and then admitted to another hospital's intensive care unit, where she was found to be suffering from severe alcohol withdrawal. When Andrea was interviewed by the sheriff because of the missing person report, she gave inconsistent accounts of what happened during the time she was missing. At one point, she told the interviewing officer she was held by R.A. against her will and at another time said the bruises were caused by a fall.

The same day David filed the missing person report, R.A. appeared at D.A.'s baseball game wanting to take M.A. from the maternal grandparents. The maternal grandparents were hesitant to allow M.A. to go with R.A. The interaction became physical and police were called to the baseball field. Witnesses who spoke with the responding officers reported M.A. did not want to leave with R.A. and that she clung to a fence screaming "no, no" as R.A. aggressively tried to pull her away. David told a responding officer that R.A. also pushed the maternal grandmother, causing her to fall. A bystander, concerned for M.A.'s safety reported that he put his arm across R.A.'s chest in an attempt to calm R.A. down and separate him from M.A. The bystander reported that R.A. then angrily left the field and sped through a parking lot filled with families and children. R.A. drove to a nearby police station, where he was told to return to the scene. Because the maternal grandparents did not have custodial rights, the officers at the scene ultimately permitted M.A. to leave with R.A.

The following day, the Agency received a report of the incident and a social worker interviewed the minors at school. M.A. reported she was scared to leave her brother's baseball game with R.A. because her mother was missing and "she did not want

3

her father to take her too."  She said after leaving the field R.A. took her to his mother's home and she saw Andrea there.  M.A. told the social worker she was scared of living with her parents and that they did not know how to take care of her.  She described an earlier incident in which Andrea left her alone at a park without telling M.A. she was leaving.

Eleven-year-old D.A. was withdrawn during his interview.  He told the social worker he and his siblings did not want to live with their parents.  He said that he was worried for M.A.'s safety because R.A. yells and is very mean, and Andrea drinks too much and cannot care for them.  D.A. denied seeing his parents hit each other, but stated R.A. gets angry for no reason and acts "very scary."  He said when this would happen the minors would hide in their room or call David to come get them.  In his interview, 13-year-old D.W. also told the social worker he was worried about M.A.'s safety and feared R.A. would take her and never bring her back.  Both D.A. and D.W. did not think their parents were capable of caring for M.A.  D.W. also denied seeing any domestic violence between his parents, but told the social worker David once had to fly to Las Vegas to get Andrea after R.A. had beat her up.  He also reported seeing R.A. yell at Andrea loudly and in her face, and that he has seen R.A. punch couches and walls out of frustration.

The social worker also interviewed R.A., who was defensive and minimized Andrea's alcohol abuse.  He told the social worker she could "keep the boys, but [he] want[ed his] daughter."  R.A. also reported that the day Andrea was hospitalized he had come home from work to find Andrea bleeding in the hallway.  He stated he showered Andrea then called 911.  The ambulance took Andrea to the hospital but R.A. did not accompany Andrea in the ambulance because he had to go back to work.

4

On May 22, 2015, the Agency filed petitions under section 300, subdivision (b), in the juvenile court on behalf of the minors alleging they suffered or were at substantial risk of suffering serious physical harm because of their parents' inability to supervise or protect them adequately. The petitions alleged specifically that the minors were exposed to a violent confrontation between R.A. and the maternal grandparents, Andrea reported violence in her relationship with R.A., and the minors were also at risk because of Andrea's alcohol abuse and R.A.'s failure to protect the minors from that risk.

At the detention hearing the juvenile court designated R.A. as the minors' presumed father, found the Agency had made prima facie showings on the allegations in the petitions, detained the minors with the maternal grandparents, and set the jurisdictional and dispositional hearing. The court granted Andrea's request for a temporary restraining order against R.A. and permitted R.A. supervised visitation with the minors. The Agency's report for the hearing indicated that the maternal grandparents had initiated a proceeding in family court to obtain guardianship of the minors.[3]

In advance of the jurisdictional and dispositional hearing, the Agency's social worker met with R.A. The social worker reported that R.A. remained defensive and accused the maternal grandparents of brainwashing the minors against him. R.A. played audio from a video he took of Andrea the day she was hospitalized, which the social worker reported was R.A. telling Andrea in an aggressive tone that there was blood everywhere and that she needed to shower. R.A. stated the children were not afraid of him and denied physically abusing them or Andrea. The social worker also conducted

---

[3] A guardianship was established by the family court on August 31, 2015.

additional interviews with the minors. All three expressed their desire to remain with their maternal grandparents, with whom they felt safe. The minors also reiterated their fear of R.A. and their desire not to live with him. D.W. stated that in the past R.A. had hit him with a belt, knocked him down and kicked him, and threatened him. D.W. stated that R.A. would force Andrea to consume alcohol, R.A. also drank, and when he did he would become very angry.

At the initial jurisdiction and disposition hearing on June 17, 2015, the Agency recommended domestic violence treatment, counseling, parenting education and substance abuse testing for R.A. R.A. contested jurisdiction and disposition and the court set the matter for an evidentiary hearing. During the time between the filing of the petitions in May and the final contested jurisdictional and dispositional hearing in September, the minors refused to attend visits with R.A., who failed to start any of the services outlined in the case plan provided by the Agency.

At the September 15, 2015 contested hearing, the court admitted the Agency's reports and related documentation into evidence. R.A. did not present any affirmative evidence. His counsel argued the Agency had failed to meet its evidentiary burden to show the minors were at risk and could not be safely placed in R.A.'s care. The juvenile court found by clear and convincing evidence that the allegations in the Agency's petition were true. The court declared the minors dependents of the court, removed them from their parents' custody and continued placement with the maternal grandparents. The court ordered reunification services for R.A. and Andrea, including domestic violence group therapy for R.A. over his objection. The juvenile court also asserted its primary jurisdiction over the minors and dissolved the guardianship issued by the family court.

6

R.A. contends the court's jurisdictional and dispositional findings were not supported by substantial evidence. With respect to the jurisdictional finding, R.A. argues the only evidence that supported the finding was the maternal grandparents' one-sided account of the May 6, 2015, altercation at D.A.'s baseball game. With respect to the dispositional order, R.A. asserts there was no evidence to support the court's finding that the minors were at risk of harm if placed with him.

I

In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether substantial evidence supports the juvenile court's findings. Evidence is "substantial" if it is reasonable, credible and of solid value. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) We do not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; *In*

7

*re Heather A.* (1996) 52 Cal.App.4th 183, 194-196.)  The focus of section 300 is on averting harm to the child.  (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)

Although "the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, italics omitted), the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection.  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135; *In re Troy D.* (1989) 215 Cal.App.3d 889, 899-900.)  A parent's past conduct is a good predictor of future behavior.  (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169-1170.)  "Facts supporting allegations that a child is one described by section 300 are cumulative."  (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1050.)  Thus, the court "must consider all the circumstances affecting the child, wherever they occur."  (*Id.* at pp. 1048.)

## II

Section 300, subdivision (b)(1), provides a basis for juvenile court jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the parent's failure to adequately supervise or protect the child or provide adequate medical treatment.  As discussed, the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  (*In re Heather A.*, *supra*, 52 Cal.App.4th at pp. 194-196.)

Exposing children to recurring domestic violence may be sufficient to establish jurisdiction under section 300, subdivision (b)(1). (See *In re Heather A.*, *supra*, 52 Cal.App.4th at pp. 193-194 [evidence of continuing violence between father and stepmother, where at least one incident occurred in presence of minors, was sufficient for

8

jurisdictional finding].)  " 'Both common sense and expert opinion indicate spousal abuse is detrimental to children.' "  (*In re E.B.* (2010) 184 Cal.App.4th 568, 576.)  Domestic violence impacts children even if they are not the ones being physically abused, "because they see and hear the violence and the screaming."  (*In re Heather A.*, at p. 192; accord, *In re S.O.* (2002) 103 Cal.App.4th 453, 460-461.)

Here, the evidence before the juvenile court supported its findings that the minors were described by section 300, subdivision (b).  The record included a history of domestic violence by R.A.  In the family's prior voluntary case with the Agency, R.A. admitted domestic violence against Andrea, described as a black eye and facial swelling.  R.A. also had two domestic violence referrals to the Agency during his first marriage.  All three minors expressed their fear of R.A. because of his temper and violent behavior.  D.W. reported that when he and his siblings were living with R.A. and Andrea, they would often retreat to their room to avoid R.A.  Further, R.A.'s violent behavior on May 6, 2015, undoubtedly supported the juvenile court's jurisdictional finding.

R.A. argues that the maternal grandparents' account of R.A.'s behavior at the baseball field was not credible and, therefore, did not support the court's jurisdictional finding.  This assertion is belied by the statements of the other witnesses.  The witness that attempted to restrain R.A. told the responding officer that he saw R.A. "aggressively pulling on" M.A. while she clung to a fence and that after the incident ended R.A. sped through the parking lot, disregarding children and families.  Another witness stated R.A. "appeared to be very aggressive and was pulling" M.A.  The juvenile court was entitled to accept this version of events.  (See *In re S.A.*, *supra*, 182 Cal.App.4th at p. 1149

9

["inconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court"].)

Further, because R.A. was unwilling to care for the minors (and Andrea's alcohol abuse prevented her from doing so), the minors had lived with their maternal grandparents for nine months by the time this proceeding was initiated. Prior to this, the evidence showed R.A. failed to protect the minors from Andrea's unsafe behavior. D.W. reported that when the minors were living with R.A. and Andrea, Andrea was often too intoxicated to care for them and D.W. had to prepare the minors' meals or call David to care for them. D.A. and M.A. likewise reported that Andrea could not care for them because of her alcohol abuse. There is no evidence in the record that R.A. protected the minors from Andrea's neglectful behavior.

Contrary to R.A.'s assertions, this was not a case involving a single, isolated incident of violence. R.A.'s violent behavior constituted a failure to protect the minors "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 194; see also *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562 [children suffer secondary abuse from witnessing violent confrontations].) Moreover, R.A. was aware of Andrea's substance abuse and made no effort to protect the minors from her. Sufficient evidence supported the court's jurisdictional findings that the minors were at substantial risk of serious physical harm as a result of their exposure to R.A.'s violent and neglectful behavior.

III

Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial

risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. (§ 361, subd. (c)(1); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1136.) We review the court's dispositional findings for substantial evidence. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105; *In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

With respect to the juvenile court's dispositional order, R.A. repeats the arguments he makes with respect to the court's jurisdiction, contending the evidence of domestic violence in the family's home was minimal and did not rise to an "extreme case of abuse or neglect" warranting removal. He asserts there was no concerning pattern of conduct leading up to the May 6, 2015, incident and that the incident was an isolated one. As discussed with respect to the court's jurisdictional findings, the juvenile court properly rejected this assertion.

Although R.A. allowed the minors to live with the maternal grandparents for nine months before this proceeding began, he contends the placement of the minors with the maternal grandparents "compounded the error of removing them in the first place, and results in [an additional] unnecessary hurdle[] for father to regain custody of his children." R.A.'s strained relationship with the maternal grandparents, however, does not negate the evidence showing his violent temper or failure to protect the minors from Andrea's neglect. Further, and contrary to R.A.'s assertions, the juvenile court took

11

appropriate steps to safeguard R.A.'s parental rights.  The court dissolved the guardianship granted by the family court and admonished the Agency to ensure the maternal grandparents did not interfere with R.A.'s efforts to reunify.

R.A. has failed to show insufficient evidence supported the court's dispositional orders maintaining placement with the maternal grandparents.

## DISPOSITION

The orders are affirmed.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.